FILED

2014 JUL 31  PM 12: 27

CLERK-U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
SANTA ANA

BY _____

1 | **COTCHETT, PITRE & McCARTHY, LLP**
JOSEPH W. COTCHETT (36324)
2 | NANCI E. NISHIMURA (152621)
MARK C. MOLUMPHY (168009)
3 | KEVIN P. O'BRIEN (215148)
ELIZABETH T. TRAN (280502)
4 | San Francisco Airport Office Center
840 Malcolm Road, Suite 200
5 | Burlingame, CA 94010
6 | Telephone: (650) 697-6000
Facsimile: (650) 697-0577
7 |
8 |
9 | **BOTTINI & BOTTINI, INC.**
FRANCIS A. BOTTINI, JR. (175783)
10 | ALBERT Y. CHANG (296065)
7817 Ivanhoe Avenue, Suite 102
11 | La Jolla, CA 92037
12 | Telephone: (858) 914-2001
Facsimile: (858) 914-2002
13 |
14 | *Attorneys for Plaintiff GREAT PACIFIC SECURITIES*

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

| | |
|---|---|
| **GREAT PACIFIC SECURITIES,** on behalf of itself and all others similarly situated, <br><br> Plaintiff, <br><br> v. <br><br> **BARCLAYS PLC, BARCLAYS CAPITAL, INC.,** and **DOES 1-5,** inclusive, <br><br> Defendants. | Case No. <br> SACV14-01210 DDP (SHx) <br><br> **CLASS ACTION COMPLAINT FOR:** <br><br> **(1)   CONCEALMENT;** <br><br> **(2)   VIOLATION OF CAL. BUS. & PROF. CODE § 17200; and** <br><br> **(3)   VIOLATION OF CAL. BUS. & PROF. CODE § 17500** <br><br> <u>**JURY TRIAL DEMAND**</u> |

CLASS ACTION COMPLAINT

# **TABLE OF CONTENTS**

**Page**

I.      OVERVIEW ...................................................................1

II.     JURISDICTION AND VENUE ...........................................3

III.    THE PARTIES ...............................................................4

    A.      Plaintiff...............................................................4

    B.      Defendants..........................................................5

IV.     FACTUAL ALLEGATIONS ...............................................6

    A.      The Evolution of "Dark Pools" ...............................6

    B.      Barclays and The Expansion of Its LX Dark Pool.............8

V.      Class allegations .........................................................19

VI.     CAUSES OF ACTION....................................................21

            FIRST CAUSE OF ACTION .................................21

            CONCEALMENT .............................................21

            SECOND CLAIM FOR RELIEF .............................22

            UNFAIR COMPETITION ....................................22

            CALIFORNIA BUS. & PROF. CODE § 17200 ....................22

            THIRD CLAIM FOR RELIEF .................................23

            FALSE ADVERTISING .......................................23

            CALIFORNIA BUS. & PROF. CODE § 17500 ....................23

VII.    REQUEST FOR RELIEF .................................................24

VIII.   JURY TRIAL DEMAND..................................................25

Plaintiff Great Pacific Securities, on behalf of itself and all others similarly situated, makes the following allegations, except as to allegations pertaining to Plaintiff, based on its investigation and the investigation of its counsel, including a review of legal and regulatory filings, press releases, media reports about Barclays PLC's and Barclays Capital, Inc., the allegations in the Complaint filed on June 25, 2014 against Barclays by the New York Attorney General, and other public statements issued by the Company.  Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.   OVERVIEW

1.      Plaintiff alleges a concealment claim against defendants Barclays PLC and Barclays Capital, Inc. ("Barclays") on behalf of a Class of all persons and entities who were clients of Barclays and whose trades were submitted for potential execution  in Barclay's Liquidity Cross ("LX") dark pool from January 1, 2011 to the present and were harmed (the "Class").  Plaintiff also asserts claims under Cal. Bus. & Prof. Code §§ 17200 and 17500 on behalf of all Class members who are California persons (the "Sub-Class").

2.      Barclays runs one of Wall Street's largest "dark pools," a private trading venue where investors can trade stocks almost anonymously.  Unlike national exchanges, like the New York Stock Exchange or NASDAQ, investors trading in a dark pool do not have to contemporaneously reveal their buy or sell orders to other investors.  Thus, they are less likely to be victimized by high frequency traders who use their rapid access to information to trade ahead of an anticipated stock purchase or sale and exploit pricing inefficiencies.

3.      Dark pools have proliferated over the past three years, as modern technology has changed the landscape of the securities markets.  Billions of dollars now change hands in thousandths of a second, or milliseconds, and speed has become the "holy grail" on Wall Street.

4.     In 2010, Barclays decided to dramatically expand its dark pool business in a quest to boost profits.  Beginning no later than 2011, and continuing to the present, Barclays promoted its dark pool platform as a means to avoid high frequency traders, providing safeguards to detect and deter "aggressive" traders and ensure that clients of its platform received the best prices for their trades. Unfortunately, Barclays' dark pool – called **Barclays LX** – was not the safe haven it was promoted and advertised to be.  Rather, under the supposedly watchful eyes of Barclays, high frequency traders were not only allowed to trade on Barclays LX, but given unfair perks over other traders to encourage them.  Indeed, contrary to Barclay's marketing materials, aggressive high frequency trading activity was rampant in Barclays LX.  While Barclays promoted and touted a proprietary system designed to monitor and curtail aggressive trading called "Liquidity Profiling," it provided little protection to its client base.

5.     In June 2014, New York Attorney General Eric T. Schneiderman filed a Complaint against Barclays under the New York Martin Act.  The NYAG alleged that Barclays concealed material information to clients about the way its dark pool was operated and did not have in place the safeguards it said it did to protect against "predatory" high frequency traders.  The NYAG also cited internal documents and emails, as well as statements by Barclays' former employees, revealing that Barclays intentionally **"falsified marketing materials"** showing the type of trading in its dark pool as part of a business strategy to dramatically increase its market share.  When asked whether other institutions were being probed, the NYAG said, referring to Barclays:  "I cannot comment on ongoing investigations. The conduct here was so egregious and ongoing we felt we had to move on this."

6.     This conduct is substantially similar to that experienced by Plaintiff and other clients of Barclays who submitted trades for execution by Barclays.. When one of Barclays' clients submitted a trade for execution,, Barclays swept its own LX dark pool with the requested trades, in addition to sweeping other trading

venues.  The purpose of sweeping multiple trading venues, including both traditional exchanges and dark pools, was purportedly to try to obtain the most advantageous execution for the client.  However, unbeknownst to Barclays' clients, when Barclays swept its LX dark pool with the information about the requested trades, large numbers of predatory traders were lurking.  They were able to obtain information about the desired trades before the trades were executed, and then trade ahead of the Barclays client, either in the LX dark pool or on any other exchange or ATS.  Thus, whenever a Barclays' client submitted a trade for execution through Barclays, and Barclays submitted the trade for potential execution in the Barclays LX dark pool, the client was harmed by the skimming of information by the predatory traders lurking in the LX dark pool, regardless of whether the Barclays' client's order ended up being executed in the LX dark pool, in another Alternative Trading System or "ATS," or on a traditional "lit" exchange.

7.      Plaintiff and other Barclays' clients wanted to avoid trading in venues where proprietary or predatory traders existed.  To convince Plaintiff and Class Members to allow their trades to be swept through the LX dark pool, Barclays concealed material information about the identity of predatory traders in LX, as well as the volume of trading in its LX dark pool being conducted by predatory traders.  By this action, Plaintiff seeks to hold Barclays responsible for the losses it has suffered from such deceptive marketing practices.

## II.      JURISDICTION AND VENUE

8.      The Court has subject-matter jurisdiction over this case pursuant to 28 U.S.C. § 1332.  Jurisdiction under § 1332(a) is proper because (a) complete diversity exists between Plaintiff and Defendants; and (b) the amount in controversy exceeds $75,000, exclusive of interest and costs.  Furthermore, jurisdiction under § 1332(d) is proper because (a) the number of members of the Class or Sub-Class exceeds 100; (b) at least one member of the Class or Sub-Class is a citizen of a state different from any Defendant; (c) at least one member of the Class or the Sub-Class

is a citizen of a state, and one Defendant is a subject of a foreign state; and (d) the amount in controversy exceeds $5,000,000, exclusive of interest and costs.

9.      Each Defendant has sufficient minimum contacts with California, purposefully avails itself of benefits from California, and/or has property in California, so as to render the exercise of jurisdiction over it by the California courts consistent with traditional notions of fair play and substantial justice. Barclays advertises and markets products and services—"from credit cards to corporate banking"—to individuals, small and medium business, and corporations and institutions in California.

10.      Each Defendant conducts business in this District.  Barclays has investment bank offices in Los Angles, Menlo Park, San Francisco, and Santa Monica.  Barclays' investment banking services include financial advisory, capital raising, financing and risk management to corporations, governments and financial institutions. Barclays also has wealth management offices in Los Angeles and San Francisco.  Barclays' wealth management services include wealth planning, trust and fiduciary services, investment management, and brokerage services to clients.

### III.   THE PARTIES

**A.   Plaintiff**

11.      Plaintiff **Great Pacific Securities** is an institutional financial services firm with its principal place of business in Costa Mesa, California. Plaintiff is a Barclays' client.  Plaintiff is a citizen of California.

12.      During the Class Period, Plaintiff was a Barclays' client and submitted trades to Barclays for execution.  Plaintiff conducted business with Barclays in reliance on omissions by Defendants and suffered damages.  Plaintiff's trades were executed by Barclays on both the Barclays LX dark pool, on traditional exchanges, and on other dark pools.  During the Class Period, Plaintiff paid Defendants a per-share commission for each trade executed by or through Barclays.

13.     Plaintiff has been harmed as a result of Defendants' wrongdoing. Defendants acquired money from Plaintiff during the time that Defendants were engaged in deceit, unfair competition, false advertising and violations of California law, including but not limited to commissions paid to Barclays for trade execution. Moreover, Plaintiff's customers submitted trades for execution by Plaintiff, and based the amount of trades given to Plaintiff on Plaintiff's performance in executing such trades.  On information and belief, as a direct result of Defendants' wrongdoing, Plaintiff's performance in executing such trades was inferior to that of Plaintiff's competitors, and Plaintiff received less business from its customers. Thus, Plaintiff suffered economic harm and damages as a result of Defendants' wrongdoing.

**B.     Defendants**

14.     Defendant **Barclays PLC** is a British multinational banking and financial services firm with its principal place of business in London, England. Barclays PLC—directly and/or through its subsidiaries—dramatically increased the market share of its dark pool by misleading clients about its operations and treatment of high-frequency traders, including in this district, during the Class Period.  Barclays PLC is a subject of a foreign state.

15.     Defendant **Barclays Capital, Inc.** ("BCI") is a securities brokerage and financial advisory services firm incorporated under the laws of Connecticut, and with its principal place of business in New York, New York.  BCI is a subsidiary of Barclays Group US, Inc., a Delaware corporation, which is a subsidiary of Barclays PLC.  BCI dramatically increased the market share of its dark pool by misleading clients about its operations and treatment of high-frequency traders, including in this district, during the Class Period.  At all times during the Class Period, its activities in the United States were under the control and direction of its British parent.  BCI is a citizen of Connecticut and New York.

16.     Defendants Barclays PLC and BCI shall together be referred to herein as "Barclays" or "Defendants."

17.     Various other individuals, partnerships, corporations, and other business entities, unknown to the Plaintiff, have participated in the violations alleged herein and have performed acts and made statements in furtherance thereof. The true names and capacities, whether individual, corporate, associate, or otherwise of Defendants Does 1 through 10, inclusive, are unknown to Plaintiff who therefore sues said Defendants by such fictitious names.  Plaintiff further alleges that each of said fictitious Doe Defendants is also responsible for the acts and occurrences hereinafter set forth.  Plaintiff will amend this Complaint to show their true names and capacities when the same are ascertained, as well as the manner in which each fictitious Defendant is responsible for the damages sustained by Plaintiff and other members of the Class and the Sub-Class.

## IV.   FACTUAL ALLEGATIONS

### A.   The Evolution of "Dark Pools"

18.     Dark pools are electronic trading venues that, unlike national public exchanges, don't contemporaneously post investors' buy and sell orders and only report trades to the public after they take place.  Dark pools are also known as Alternative Trading Systems or "ATS."

19.     Dark pools were first established to avoid large block orders from influencing financial markets and ensure privacy, and until recently, dark pool activity constituted a mere three to five percent of all trading in the market.

20.     In 2007, however, the SEC passed Regulation NMS (National Market System), which allowed investors to bypass public exchanges to gain price improvements.  Investors took advantage of Regulation NMS and started to send more trades to dark pools for execution.  Thus, the volume of trades executed by the dark pools significantly increased after 2007, and trading volume on the eleven traditional public stock exchanges decreased.

21.     Today, an estimated 14% of United States stock-market volume is executed in dark pools.  According to FINRA, the three largest dark pools in the United States are run by large institutional banks, Credit Suisse, UBS AG, and Barclays.  According to estimates, the combined commissions for the three banks alone, based on executed trades, was $800 million in 2013.  There are a number of smaller dark pools that are either independently owned or controlled by consortia of banks, buy they typically represent a small percentage of daily trading volume of stocks.

22.     Ironically, while dark pools were designed to help give investors a safe haven from rapid traders, many dark pools are now "stomping grounds" for high-speed firms.  In high frequency trading, investors use computers to buy and sell stock at extremely quick speeds to take advantage of small, momentary changes in stock prices.  According to some reports, over 50% of all equity trading volume is from high frequency traders.  Because trading details in dark pools are typically delayed, high frequency traders try to link their computers with those of the public exchanges and dark pools and often pay for direct feeds of information that retail investors cannot get.  This allows them to identify large trades, often from institutional investors, and then "trade ahead" of the purchase and exploit the inefficiencies of price delays.

23.     In his book, "Flash Boys," released in 2014, Michael Lewis wrote that bank-owned dark pools now often serve as a key intersection between high-frequency traders and banks' investor clients.  The banks charge high-frequency traders for the right to trade against orders placed by their brokerage customers.  "Why would anyone pay for access to the customers' orders inside a Wall Street bank's dark pool?" Lewis wrote.  "The straight answer was that a customer's stock market order, inside a dark pool, was fat and juicy prey."

**B.     Barclays and The Expansion of Its LX Dark Pool**

24.     Barclays describes itself as a major global financial services provider engaged in personal banking, credit cards, corporate and investment banking, and wealth and investment management with an extensive international presence in Europe, the Americas, Africa and Asia.  Barclays operates in over 50 countries and, according to its website, "moves, lends, invests and protects money for customers and clients worldwide."

25.     According to Barclays, its "business model" offers clients "a rounded value proposition – a full range of products and services – and thereby, we aim to achieve a smoother income stream and sustainable returns."  Its operations include retail banks in the UK, Africa, and Europe, as well as investment banking and wealth management services that it offers on a global basis, including in California.  With respect to such services, Barclays has declared its commitment to working with regulators to reduce risk to both clients and the industry as a whole, stating "Our international reach and scale means we have the responsibility, indeed obligation following our designation as a Global Systemically Important Financial Institution, to work together with our regulators to de-risk the industry and provide a more sustainable banking landscape over the long term."

26.     By 2010, just prior to the start of the Class Period, Barclays had become one of the largest banks in the world, with extensive operations in the United States and in California specifically.  However, internally, it was on a desperate quest to boost revenues.

27.     In 2010, executives at Barclays initiated a concerted plan to expand its stock-trading business, and a core ingredient of the plan was to boost trading in its dark pool ATS, known as Barclays LX, shorthand for "Liquidity Cross."

28.     Barclays asked Bill White to spearhead the effort.  White had worked on Wall Street for years and ran Barclays' market-making unit on the floor of the New York Stock Exchange.

29.     In 2011, Barclays informed its employees to push more order flow to the dark pool.  According to the NYAG Complaint, Barclays told employees that "[a]ggregating [order] flow into Barclays LX has strategic and economic value for the entire Equities business," allowing the bank to earn more fees and avoid paying commissions for trades on other venues.  According to the NYAG, internal Barclays' documents valued this growth opportunity at between $37 and $50 million per year.  The project was so important to Barclays that employees internally referred to the dark pool as "The Franchise."

30.     According to a former senior Director at Barclays cited by the NYAG, "[a]t every sales meeting or product meeting, the main goal they were talking about was to grow the size of [Barclays' dark pool] to become the largest pool.  All the product team's goals, which would also include their compensation[,] were tied to making the pool bigger.  [Barclays had] great incentive at all costs to make the pool bigger."

31.     In 2012, White hired a trusted friend to help his efforts, Dave Johnsen, to help run electronic trading at Barclays.  Johnsen had previously served as a senior executive at Goldman Sachs Group Inc.'s dark pool, but was reportedly fired in 2012 by Goldman Sachs for "concerns relating to the performance of his supervisory responsibilities," including not completing certain reports on a timely basis, according to FINRA's BrokerCheck.  In the BrokerCheck report, Johnsen admitted that "the dates didn't reflect the date I completed the reports."  After joining Barclays, Johnsen worked closely with White, and soon was running the day-to-day operations of Barclays LX while White worked on client relationships.

32.     Barclays contacted existing brokerage clients and other investors, to steer their business to its dark pool, and to convince them to allow their trades to be submitted for potential execution in Barclays LX.  Barclays used a full court press of marketing materials representing that its dark pool provided a safe, transparent

trading environment, and helped protect its clients from the risks of aggressive high frequency traders.

33.     Part of the selling point of dark pools is that by keeping orders to transact securities private, they are less likely to be prowled by speed traders looking to beat investors who are slower to react to new information.  Seeking to reassure customers that their stock orders wouldn't be picked off by predatory counterparties, Barclays's marketing materials touted its "Liquidity Profiling" service by which it purportedly monitored and policed trading behavior in its dark pool.  As described below, these materials purported to show that very little of the trading within its dark pool was "aggressive" and that operating there was safe for its clients.

34.     Barclays' executives made similar statements to the financial press. For example, in "Finding the 'Right' Liquidity, published on March 14, 2013 on marketsmedia.com, Barclay's White touted the Liquidity Profiling feature on its LX dark pool to protect clients trading in the dark:  "It's a sophisticated surveillance framework that protects clients from predatory trading activity in LX, the second-largest broker-dealer dark pool in the U.S. . . . By identifying aggressive behavior, we can take corrective action with clients who exhibit opportunistic behavior in the pool."   Similarly, in "Dark Pools deliver price improvement and anonymity, published on June 6, 2013 in Hedgeweek, White touted the firm's ability to identify "low toxicity flow" in it pool and "to restrict HFTs [High Frequency Traders] interacting with our clients."

35.     Barclays' marketing efforts were hugely successful.  Today, Barclays LX is the second-largest dark pool in the United States, according to data from FINRA.  However, as alleged herein, Barclays achieved such success only by concealing from its clients the actual operations of its dark pool, the true extent of aggressive high frequency trading activity in the pool, and the level of protection Barclays provided from such activity.

36.     During the Class Period, Plaintiff Great Pacific Securities was contacted by Barclays and provided with marketing materials describing the Barclays LX pool.  One of such documents, entitled, "Liquidity Products," dated February 2012, and attached hereto as Exhibit A, purported to show Plaintiff how it would be protected from aggressive high frequency trading activity, and underscored Barclays' purported commitment to transparency.  Barclays represented that its LX dark pool provided "continued quantitative research on the Liquidity Profiling initiative to protect customer order flow."  Specifically, "[t]he objective of the new LX Liquidity Profiling framework is to increase fill rates and improve performance for institutions trading in LX by targeting beneficial counterparties."  With respect to the Electronic Liquidity Provider or "ELP" segment – Barclay's term for high frequency traders – Barclays reassured investors that it was able to "proactively monitor" and distinguish between "aggressive" clients and those who provided "beneficial liquidity" in order to "improve the quality of flows into the pool."

37.     The marketing materials provided to Plaintiff also contained a number of misleading, graphical charts.  One chart contained a number of colored circles, representing "the top 100 clients in LX."  The size of the circles on the chart corresponded to the level of trading activity conducted in the dark pool by that firm, with traders assigned colored circles based on their trading characteristics.  Within the chart are two color-coded, rectangle regions, a green region representing "passive clients" with safe trading activity, and a red rectangle representing "aggressive clients" with unsafe trading, leaving the clear message that very little trading in the pool was "aggressive."

38.     Another chart in the materials stated that only 14% of trading in the pool was by aggressive high frequency traders.  Alongside both charts, Barclays reaffirmed its ability to "constantly monitor flow quality" with the "Liquidity Profiling" framework, providing "transparency" and "improving the overall quality" of LX.  Specifically, Barclays touted its ability to hold aggressive traders "accountable" by "refusing a client access" and "suppress[ing]" "aggressive flows."  The chart is reproduced below:



39.     Based on allegations in the NYAG Complaint, Barclays used virtually identical marketing materials with other clients during the Class Period, including a widely-disseminated document intended for institutional clients entitled, "Liquidity Profiling – Protecting You in the Dark."  Like the brochure provided to Plaintiff, that document included an analysis purporting to represent the "liquidity landscape" of Barclays' dark pool, along with colored circles supposedly representing firms trading in Barclays' dark pool and the level of their trading activity.  The document also contained the same color-coded regions, a green rectangle representing

"passive" trading activity, and a red rectangle representing "aggressive" trading. As with the materials provided to Plaintiff, Barclay's chart represented that very little of the trading in Barclays' dark pool was "aggressive," that most trading in the dark pool was "passive," and that most of the high frequency activity was "passive."

40.     These charts, substantially similar in their form and message, and distributed throughout the Class Period to Class members, concealed the true nature and extent of aggressive, high-frequency trading within Barclays' dark pool.

41.     Indeed, the NYAG Complaint cites several October 2012 emails from Barclays employees regarding a decision to remove data from a version of this chart used in marketing materials showing that a particularly large high-frequency firm, Tradebot Systems Inc., participated in its dark pool. Specifically, on October 5, 2012, a draft version of the analysis was emailed to senior executives in Barclays' Equities Electronic Trading division, with a note that Barclays "de-emphasized the number of ELPs [electronic liquidity providers, or high frequency traders] by moving them to the back." The email also stated that the chart "remov[es] Tradebot," which on information and belief was the largest participant in Barclays' dark pool. When one employee objected to the modified chart, stating that removing Tradebot from the analysis was a falsification of the data, a Director in the Equities division allegedly responded that "the point of the chart is not to show what's in the pool. The point is to market our capability . . . to monitor individual participants in the pool."

42.     The issue did not die, however. According to the Wall Street Journal article, "Barclays Pool Drew Fast-Trade Alarms," dated July 21, 2014, other employees continued to raise concerns. Further, as alleged by the NYAG, a Vice President responsible for selling the dark pool to clients confirmed that the chart was meant to show the actual traders, replying to the group that "[m]y point when selling that picture was always: 'here is a snapshot of the participants in [Barclays' dark pool] as an accurate view of our pool.' I was never using it like an

'illustration'" of Barclays capability to monitor the pool. "I had always liked the idea that we were being transparent, but happy to take liberties if we can all agree." According to the NYAG, Barclays' Head of Product Development – the position held by Dave Johnsen – agreed and responded, "I think the accuracy [of the chart] is secondary to [the] objective" of showing clients that Barclays monitors the trading in its dark pool, and "so if you want to move/kill certain bubbles, it doesn't really matter." Barclays' Head of Equities Sales responded, "Yes! U smart."

43.    According to the NYAG, in another email that same day, Barclays' Head of Equities Sales noted in reference to the analysis that some in the industry viewed Barclays' dark pool as a "toxic landfill," and so "[i]f we can help ourselves we should[;] its in our control."

44.    The marketing materials also concealed information about the level of aggressive trading activity occurring in Barclays' dark pool.  For example, in the materials sent to Plaintiff in 2012, Barclays claimed that the trading in its dark pool was "23% passive," "63% neutral," and just "14% aggressive.  Similarly, in marketing materials released in early 2013, Barclays claimed that the trading in its dark pool was "48% passive," "43% neutral," and "9% aggressive."  In March 2014, Barclays said that trading in its dark pool was "36% passive," "58% neutral," and just "6% aggressive."  These progressively improving figures concealed the actual nature and extent of "aggressive" activity in Barclays' dark pool.  According to the NYAG Complaint, in March 2014, Barclays admitted to a high frequency trading firm that about 25% percent of the orders taking liquidity in its dark pool were aggressive.  In an internal document identified by the NYAG, the same firm concluded, based on the data provided by Barclays, that the trading activity in Barclays' dark pool was "50% aggressive."

45.    In fact, according to the NYAG Complaint, Barclays has never prohibited a single firm from participating in its dark pool, despite knowledge of

aggressive trading in its dark pool.  For example, according to the NYAG, on January 16, 2014, senior leaders in the Equities Electronic Trading division were told of over a dozen major high frequency trading firms engaged in significant trading activity in Barclays' dark pool, including one firm whose trades were described as "historically . . . very toxic."  Barclays did not deny them access to its dark pool.  This contradicts representations in materials provided to clients, including Plaintiff, that Barclays will try to identify "aggressive" flows, hold such traders "accountable," and "refuse a client access" to the dark pool if such aggressive trading strategies are discovered.

46.    Barclays also concealed from Plaintiff and the Class that it applied "overrides" to a number of traders in the dark pool, improperly assigning them safe Liquidity Profiling ratings, and further concealed that Liquidity Profiling did not apply to a significant portion of the trading activity in Barclay's dark pool, such as when client orders are routed to the dark pool via Barclays' proprietary algorithms. As revealed in the NYAG investigation, Barclays was well aware of these Liquidity Profiling issues, and in an internal document dated December 2013, admitted that "Liquidity Profiling reviews may not be completed for all clients, may rely on inaccurate information and results and rationale for profiling changes may not be evidenced; leading to reputational damage as the service . . . may not function as advertised to clients."  The NYAG also cited interviews with high ranking employees, including a former Barclays Director in the Equities Electronic Trading division, who said that Barclays "purport[s] to have a toxicity framework that will protect you when everybody knows internally that that thing is done manually with outliers removed and things are classified [only] if they feel like it." Another former Director in the Equities Electronic Trading division allegedly told the NYAG that Liquidity Profiling is "a scam."

47.    Barclays not only failed to weed out high frequency traders, but actually encouraged them to continue using its pool, all the while concealing this

from Plaintiff and other members of the Class and the Sub-Class. For example, while Barclays told clients like Plaintiff that it was able to "refuse" access to aggressive, high frequency traders, it supplied high frequency trading firms with advantages over more traditional investors trading in its dark pool. As described by one former senior-level Director within the Equities Electronics Trading division, cited by the NYAG Complaint, "Barclays was doing deals left and right with high frequency firms to invite them into the pool to be trading partners for the buy side. So the pool is mainly made up of high frequency firms." "[T]he way the deal would work is [Barclays] would invite the high frequency firms in. They would trade with the buy side. The buy side would pay the commissions. The high frequency firms would pay basically nothing. They would make their money off of manipulating the price. Barclays would make their money off the buy side. And the buy side would totally be taken advantage of because they got stuck with the bad trade . . . this happened over and over again."

48.     Further, as alleged by the NYAG, Barclays repeatedly disclosed information to high frequency trading firms to encourage them to increase their activity in Barclays' dark pool, including data that helped those firms maximize their aggressive trading strategies, such as the routing logic of Barclays' order router, the percentage of Barclays' internal order flow that was first directed into its own dark pool, and a breakdown of trades executed in the dark pool by participant type and "toxicity" level.

49.     Barclays also reportedly charged little or nothing to high frequency trading firms to trade in its dark pool, and allowed high frequency traders to "cross-connect" to its servers. According to the NYAG, this practice continues even today and several dozen high frequency trading firms are still linked to Barclays and able to take advantage of Barclays' non-high frequency trading clients.

50.     Barclays' concealment about the identity and volume of predatory traders in its LX dark pool was harmful to Plaintiff and the Class regardless of

1  whether the clients' trades were ultimately executed in the LX dark pool or some

2  other exchange or dark pool, since the predatory traders in LX obtained information

3  from the requested trades that Barclays swept across LX and then traded ahead of

4  the trades of Barclays' clients, harming Barclays' clients.

5      51.     During the Class Period, when Barclays' clients submitted a trade

6  for execution to Barclays, Barclays swept its own LX dark pool with the requested

7  trades, in addition to sweeping other trading venues.  The purpose of sweeping

8  multiple trading venues, including both traditional exchanges and dark pools,

9  purportedly was to try to obtain the most advantageous execution for the client.

10 However, unbeknownst to Barclays' clients, when Barclays swept its LX dark pool

11 with the information about the requested trades, large numbers of predatory traders

12 were lurking.  They were able to obtain information about the desired trades before

13 the trades were executed, and then trade ahead of the Barclays' client, either in the

14 LX dark pool or on any other exchange.  Thus, whenever a Barclays' client

15 submitted a trade for execution through Barclays, they were harmed by the

16 skimming of information by the predatory traders lurking in the LX dark pool,

17 regardless of whether the Barclays' client's order ended up being executed in the

18 LX dark pool, another ATS, or any other traditional "lit" exchange.

19     52.     Plaintiff and other Barclays' clients wanted to avoid trading in

20 venues where proprietary or predatory traders existed.  To convince Plaintiff and

21 Class Members to allow Barclays to execute their trades, and to allow their trades to

22 be swept through the LX dark pool for potential execution, Barclays concealed

23 material information about the identity of predatory traders in LX, as well as the

24 volume of trading in its LX dark pool being conducted by predatory traders.

25 Barclays concealed these material facts from both its retail and institutional clients,

26 since it wanted to maximize volume and liquidity in its LX dark pool.  Regardless

27 of whether trades ended up being executed in its LX dark pool, Barclays wanted to

28 increase the liquidity and volume of requested trades in the LX dark pool, since

increased liquidity and volume were attractive to clients, and thus increased the willingness of clients to trade in the LX dark pool.  Thus, Barclays concealed material facts from Plaintiff and the Class in order to induce them to allow their trades to be submitted for potential execution in the LX dark pool.

53.     The advantage to the predatory traders, however, was unique – they would be allowed to see the requested trades and then utilize that information to their advantage, either by trading ahead of Barclays' other clients on the LX or other trading venues, or otherwise utilizing the information to their advantage and to the disadvantage of Barclays' other clients.

54.     Barclays' conduct with respect to its LX dark pool appears to be part of a systemic, firm-wide pattern of deceptive and unfair business practices. Barclays was the first bank to be fined for rigging the benchmark interest rates, costing Bob Diamond, the bank's CEO at the time, his job.  It was also fined in May 2014 for manipulating gold prices.  On July 29, 2014, the *Wall Street Journal* reported that banking regulators may install government monitors inside Barclays' United States offices after concluding that the bank may have manipulated the foreign-exchange market.  According to the London Times, Barclays recently created a Compliance Career Academy in partnership with Cambridge University to try to restore its reputation.  The bank's chairman, David Walker, conceded: "Compliance has not been seen as a serious enough specialist activity.  Our track record in culture has not been good.  It's important for us all to have a concept of culture, conduct and compliance."  Given the series of incidents, Walker also said the bank had to work on the basis that "we are guilty until we prove ourselves to be innocent."

1

## V.    CLASS ALLEGATIONS

2      55.      Plaintiff brings this action as a class action under Rule 23 of the

3   Federal Rules of Civil Procedure on behalf of the following Class:

4          **All persons and entities who, during the Class Period (January 1,**

5          **2011 to the present), were clients of Barclays and whose trades**

6          **were submitted for potential execution in the Barclays Liquidity**

7          **Cross ("LX") dark pool and suffered harm as a result (the**

8          **"Class").**

9   Plaintiff further brings this action on behalf of the following Sub-Class:

10         **All Class Members who, during the Class Period (January 1, 2011**

11         **to the present), were California residents (the "Sub-Class").**

12  Excluded from the Class and Sub-Class are the Defendants herein, and their

13  subsidiaries, parents, affiliates, and controlled persons or entities, including

14  specifically all of their past or present or officers and directors.  For the

15  avoidance of any doubt, also excluded from the Class and Sub-Class are the

16  predatory and proprietary traders who utilized any information obtained from

17  Class and Sub-Class members from the LX dark pool exchange to benefit

themselves and harm the Class and Sub-Class members.

18     56.      The members of the Class and Sub-Class are so numerous that

19  joinder of all members is impracticable.  Plaintiff does not know the exact number

20  of Class and Sub-Class members because such information is in the exclusive

21  control of Defendants.  Upon information and belief, there are hundreds or

22  thousands of Class and Sub-Class members, geographically dispersed, such that

23  joinder of all class members is impracticable.

24     57.      Plaintiff's claims are typical of the claims of the members of the

25  Class and Sub-Class, as Plaintiff used the Barclays LX and the claims are based

26  upon similar conduct affecting all and Class and Sub-Class members.

27     58.      Plaintiff will fairly and adequately protect the interests of the

28

members of the Class and Sub-Class and has retained counsel competent and experienced in class litigation.  Plaintiff has no interests which are contrary to or in conflict with those of the Class and Sub-Class members which it seeks to represent.

59.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual members may be relatively small, the expense and burden of individual litigation make it virtually impossible for the Class and Sub-Class members to individually seek redress for the wrongs done to them.  Plaintiff knows of no difficulty which will be encountered in the management of this litigation which would preclude its maintenance as a class action.

60.     There is a well-defined community of interest in the questions of law and fact involved in this case.  Common questions of law and fact exist as to all members of the Class and Sub-Class, and predominate over any questions affecting solely individual members of the Class and Sub-Class.  Questions of law and fact common to the Class and/or Sub-Class include, but are not limited to:

(a)     whether Plaintiff and the Class and Sub-Class members were Barclays' clients during the Class Period;

(b)     Whether Plaintiff and the Class and Sub-Class members had one or more trades submitted by Barclays for potential execution in the Barclays LX dark pool during the Class Period;

(b)     whether Defendants engaged in unfair and/or unlawful business practices;

(c)     whether Defendants disseminated advertisements that had a tendency to mislead a reasonable person;

(d)     whether Defendants had a duty to disclose and omitted to disclose material facts;

(e)     whether Class and Sub-Class members were harmed;

(f)    whether declaratory, injunctive and/or restitutionary relief is appropriate and, if so, the proper measure of the relief.

61.    The names and address of the Class and Sub-Class members are available from the business records of Defendants.  Notice can be provided by first class mail and by using other techniques customarily used in class actions.

## VI.   CAUSES OF ACTION
## FIRST CAUSE OF ACTION
## CONCEALMENT
### (On Behalf of Plaintiff and the Class)

62.    Plaintiff hereby incorporates all of the foregoing paragraphs.

63.    As a result of the conduct described herein, Barclays committed deceit by concealment.

64.    Barclays intentionally failed to disclose important facts to Plaintiff and the Class concerning the LX exchange, including the nature and extent of aggressive high frequency trading activity in the LX dark pool and its efforts to monitor and curb such trades.

65.    Barclays further disclosed some facts to Plaintiff and the Class but intentionally failed to disclose other important facts, making the disclosure deceptive.

66.    Barclays further actively concealed important facts from Plaintiff and the Class and/or prevented Plaintiff and the Class from discovering such facts.

67.    Plaintiff and the Class were unaware of the true facts that were concealed, and had no means of ascertaining such concealed facts.

68.    Barclays intended to deceive Plaintiff and the Class by concealing these facts.

69.    At all relevant times, Plaintiff and the Class reasonably relied on Barclays' deception and would have acted differently had they known the true facts. Moreover, these concealed facts were highly material to Plaintiff and the Class, and

Plaintiff and the Class would not have paid fees or commissions, or allowed Barclays to submit their trades for potential execution in the LX dark pool, had they known the true facts.

70.     As a result of Barclays' concealment, Plaintiff and the Class were harmed and Barclays' concealment was a substantial factor in causing the harm.

**SECOND CLAIM FOR RELIEF**

**UNFAIR COMPETITION**

**CALIFORNIA BUS. & PROF. CODE § 17200**

**(On Behalf of Plaintiff and the Sub-Class)**

71.     Plaintiff hereby incorporates all of the foregoing paragraphs.

72.     The California Unfair Trade Practices Act defines unfair competition to include any "unfair," "unlawful," or "fraudulent" business act or practice.  Cal. Bus. & Prof. Code § 17200.  Unfair competition also includes "unfair, deceptive, untrue or misleading advertising."  *Id.*  The Act also provides for injunctive relief and restitution for violations.  *Id.*  § 17203.

73.     This cause of action is brought on behalf of Plaintiff, members of the Sub-Class, and members of the California general public pursuant to California Bus. & Prof. Code § 17200 *et seq.*  Under Bus. & Prof. Code § 17200 *et seq.*, Plaintiff is entitled to enjoin Barclays' wrongful practices and to obtain restitution for the monies paid to Barclays by reason of Barclays' unlawful, unfair, and/or deceptive acts and practices.

74.     As a direct and proximate result of the acts and practices alleged above, Plaintiff, and members of the Sub-Class and the general public who were clients of Barclays and had their trades submitted by Barclays for potential execution in Barclays' LX dark pool have been injured.

75.     Barclays' unlawful, unfair, and fraudulent business acts and practices, as described above, present a continuing threat to Plaintiff and members of the Sub-Class and of the general public, in that Barclays is continuing, and will

continue, unless enjoined, to commit violations of Bus. & Prof. Code § 17200 and other laws. This Court is empowered to, and should, grant preliminary and permanent injunctive relief against such acts and practices.

76. Barclays' conduct is "unlawful" because Barclays committed false or untrue advertising in violation of Cal. Bus. & Prof. Code § 17500.

77. Barclays' conduct also is "unfair" due to the conduct alleged herein.

78. Barclays' conduct also violates Bus. & Prof. Code § 17200 because Barclays's conduct, as alleged herein, is "fraudulent."

79. Plaintiff, on behalf of itself and the Sub-Class, seeks restitution of all money and property which Barclays obtained or may have obtained from Plaintiff and the Sub-Class as a result of its unfair business practices.

**THIRD CLAIM FOR RELIEF**

**FALSE ADVERTISING**

**CALIFORNIA BUS. & PROF. CODE § 17500**

**(On Behalf of Plaintiff and the Sub-Class)**

80. Plaintiff hereby incorporates all of the foregoing paragraphs.

81. Barclays, acting directly or indirectly with intent to induce Plaintiff, the Sub-Class, and the members of the California general public to allow Barclays to execute their trades, in violation of Cal. Bus. & Prof. Code § 17500, made or disseminated or caused to be made or disseminated the deceptive statements alleged in this Complaint.

82. The statements and representations made by Barclays were deceptive and concealed important information, and were known, or which by the exercise of reasonable care should have been known, to be deceptive and misleading.

83. Barclays made or disseminated or caused to be made such statements as part of a plan or scheme with no intent to sell its services as so advertised.

84.    Plaintiff actually saw and relied upon one or more of Barclays' advertisements, representations, and statements, and suffered actual injury and harm as a result of Barclays' violation of Cal. Bus. & Prof. Code § 17500.

## VII.   REQUEST FOR RELIEF

WHEREFORE Plaintiff requests judgment against Defendants as follows:

A.    A declaration that this action is a proper class action under F.R.C.P. 23 on behalf of the Class and Sub-Class as defined herein, and an order directing that reasonable notice of this action be given to each member of the Class and Sub-Class;

B.    A declaration that Barclays' conduct alleged herein constitutes a violation of California Bus. & Prof. Code § 17200 and a violation of Bus. & Prof. Code § 17500;

C.    An injunction enjoining, preliminarily and permanently, Barclays from continuing the unlawful conduct alleged herein;

D.    An award for Plaintiff and the Class and Sub-Class for the costs of this suit (including expert fees), and reasonable attorneys' fees, as provided by law;

E.    Restitution for Plaintiff and the Class and Sub-Class on the claims; and

F.    All such other and further relief as the Court deems just and proper.

# VIII. JURY TRIAL DEMAND

Plaintiff demands a jury trial of all issues subject to adjudication by a trier of fact.

Dated: July 31, 2014

Respectfully submitted,

**COTCHETT, PITRE & McCARTHY, LLP**

Mark C. Molumphy (168009)
San Francisco Airport Office Center
840 Malcolm Road, Suite 200
Burlingame, CA 94010
Telephone: (650) 697-6000
Facsimile: (650) 697-0577

**BOTTINI & BOTTINI, INC.**

Francis A. Bottini, Jr. (175783)
7817 Ivanhoe Avenue, Suite 102
La Jolla, CA 92037
Telephone: (858) 914-2001
Facsimile: (858) 914-2002

*Attorneys for Plaintiff Great Pacific Securities*

Exhibit A



# Liquidity Products

Equities | Electronic Trading

February 2012

Confidential Presentation

# Table of Contents

1.      Algorithmic Trading Strategies

2.      LX® Liquidity Cross

3.      Dynamic Router

4.      Portfolio WebBench® Analytics

        Appendix



# Barclays Capital Equities

**Highlights**

- #3 Liquidity Provider on Nasdaq[1]

- Barclays Capital's LX is the 3rd largest broker-dealer dark pool with ADV over 138M shares[2]

- Largest DMM on New York Stock Exchange, representing over 1,000 listed securities

- Automated Volatility Trading makes markets in over 2,000 options issues across 5 exchanges

- #2 for Overall Trading Quality in US Equities (*Greenwich Associates*, 2011)

**LX ADV and Market Share Growth**



**Nasdaq Top Market Participants[1]**

| Rank | Market Maker | Volume | Market Share (%) |
|------|--------------|--------|------------------|
| 1 | Citadel Securities LLC | 78,452,798 | 7.55 |
| 2 | Merrill Lynch, Pierce, Fenner & Smith | 54,275,633 | 5.22 |
| 3 | **Barclays Capital** | **50,851,664** | **4.89** |
| 4 | UBS Securities LLC | 46,435,142 | 4.47 |
| 5 | Goldman, Sachs & Co. | 39,743,555 | 3.82 |
| 6 | Deutsche Bank Securities Inc | 37,157,191 | 3.58 |
| 7 | JP Morgan Securities LLC | 32,472,823 | 3.13 |
| 8 | Knight Capital Americas LP | 29,058,982 | 2.80 |
| 9 | Citigroup Global Markets Inc | 20,622,188 | 1.98 |
| 10 | Pershing LLC | 5,304,389 | 0.51 |

1. *Nasdaqtrader.com; Daily Share Volume Retrieved 3 February, 2012*
2. *Rosenblatt January 2012 market structure report – December 2011 data*



## Algorithmic Trading Strategies

# Equities Algorithmic Trading Strategies

## Benchmark-Driven Strategies

| Strategy | Description | US | EMEA | Asia |
|---|---|:---:|:---:|:---:|
| **Implementation Shortfall** | Minimizes slippage relative to arrival price | ● | ● | ○ |
| **VWAP** | Minimizes slippage relative to the market Volume-Weighted Average Price (VWAP) | ● | ● | ● |
| **With Volume** | Participates with actual market activity at a user-specified percentage | ● | ● | ● |
| **TWAP** | Spreads the order evenly over the user-specified time horizon | ● | ● | ● |
| **Portfolio Target Strike** | Minimize implementation shortfall on a portfolio level | ● | ○ | ○ |
| **Target Close** | Minimizes market impact into the close and controls participation in the closing auction | ● | ● | ○ |

## Trader-Defined Strategies

| Strategy | Description | US | EMEA | Asia |
|---|---|:---:|:---:|:---:|
| **BARX® Hydra** | Spreads child orders over multiple dark pools (including Barclays Capital LX Liquidity Cross); It rebalances the order based on fill success rates | ● | ● | ○ |
| **Rapid** | Executes orders quickly whenever liquidity is available at a price better than the fair value | ● | ○ | ○ |
| **Escalate** | Adjusts aggressiveness dynamically based on price or relative performance to a user-specified benchmark | ● | ● | ○ |
| **Pairs Trader** | Automatically execute paired buy and sell orders in relative value trades. The user specifies the deal terms, target spread and execution method | ● | ● | ○ |
| **Custom Algorithms** | Create custom execution strategies using a combination of actions and triggers | ● | ○ | ○ |



# Electronic Equity Options Trading

**Algorithmic Trading Strategies**

**Barclays Capital offers best-in-class options execution tools, accessible from the most widely used order and execution management systems, in a streamlined, user-friendly package**

## Options Dynamic Router

The Dynamic Router is able to seek out liquidity based on the best available prices, combining sweeping, posting and reserve functionality in a single, low-latency execution product

### Options Work & Pounce

The strategy works the order passively until aggressive size, price and time constraints are satisfied



### Spread Trader

Provides for greater access to liquidity by trading legs across all exchanges rather than being dependent on a single exchange



### Options TWAP

TWAP allows traders to execute large options orders evenly over the specified time horizon to reduce impact and information leakage



### Volatility Trader

The strategy works at a volatility level implied from user-specified reference prices and optionally executes stock to maintain desired delta exposure





3

# Implementation Shortfall (IS)

**Barclays Capital's pioneering IS algorithmic trading strategy minimizes slippage relative to arrival price by dynamically optimizes order placement. The algorithm continuously evaluates the trade-offs between current price, market impact, expected future volatility and liquidity, across the entire trading period.**

### Traditional Strategies vs. Barclays Capital Implementation Shortfall

| Traditional IS Strategies | Barclays Capital's Implementation Shortfall |
|---|---|
| • Static execution schedule is pre-determined at the beginning of the trading period | • Real-time dynamic approach optimizes placement of each child order |
| • Schedules tend to be front-loaded and favor rapid execution | • Dynamic scheduling executes across the entire allotted trading time period |
| • Execution risk does not take into account the opportunity costs of not executing | • Opportunity cost is explicitly accounted for in the modeling of execution risk |
| • No explicit anti-gaming features | • Undetectable trading pattern leaves minimal footprint, minimizes risk of gaming |

**Benefits**

• Minimizes information leakage and potential for gaming created by pre-set schedules

• Based on real-time market conditions

• Behavior is consistent with traders' intuition but based on fully analytical model

### Behavior Highlights

• The best case for this strategy is sustained two-sided volatility where the algorithm will opportunistically participate when prices are in-the-money

• The worst case is sustained momentum in the direction of the trade where the algorithm will slow down and be forced to complete the trade as the end time nears; optimal duration will reduce the horizon according to urgency to minimize the risk of extreme tail outcomes



# New BARX® Hydra
# Maximize liquidity. Minimize footprint.

**Algorithmic Trading Strategies**

**The all-new BARX Hydra is re-engineered and powered by our smartest logic yet. Because three brains are better than one.**

## The Three Brains of Hydra

**What is the optimal order placement strategy?**

No pre-determined trade scheduling here. Hydra is built on Barclays Capital's Implementation Shortfall strategy which determines the optimal order size in response to real-time price movements. Its dynamic behavior minimizes slippage and information leakage.

**What is the optimal amount to get done in the dark?**

The Step-Ahead function will take into consideration the impact of executing in the dark and will optimize the order size determined by IS to take advantage of liquidity and price.

**What is the optimal way to allocate the order among dark venues?**

The Dark Liquidity Accessor (DLA) predicts and learns where liquidity resides at the symbol-by-venue level and manages the placement of dark orders to capture liquidity and avoid gaming. Dark and lit orders are simultaneously placed to further reduce footprint.



## Configurable and Gaming Proofed

**Configurable**

Hydra maximizes execution rates in dark pools and opportunistically executes on traditional markets. It is configurable to execute in dark and lit venues, intelligently adjusting exposure when liquidity is discovered.



Lit

25-50%*

10-25%

5-10%

Aggressive | Neutral | Quiet | Dark Only

Dark

**Gaming Proofed**

- IS dynamic scheduling vs. static scheduling to minimize information leakage
- DLA optimal allocation across dark venues to avoid gaming
- Real-time detection and reaction to gaming by venue
- Cost of dark execution factored into dark allocation model
- Simultaneous placement of lit and dark orders reduces footprint



_* Volume limits are approximate and may not reflect actual participation_



# When To Use…

**Algorithmic Trading Strategies**

| Implementation Shortfall  BARX Hydra |
|---|

- IS will minimize slippage relative to the arrival price by utilizing a dynamic engine to continually optimize placement of child orders, based on current price, market impact, time remaining and expected future volatility
- IS will complete the order, barring any volume or limit price restrictions

- Hydra will use the same logic as IS, but will look to maximize execution rates in dark liquidity pools; Hydra will intelligently adjust exposure to certain dark pools once liquidity is discovered
- Hydra will look to complete, but it is not guaranteed to do so depending on market volume.

- Both strategies have urgency level settings which can be adjusted to trade stocks of various market capitalization; a lower urgency level is a better tactic for small cap names (IS Low, Hydra Dark or Hydra Quiet)

| Rapid  Dynamic Router |
|---|

- When seeking liquidity aggressively, both Rapid and the Dynamic Router have access to major US exchanges, ECNs, LX Liquidity Cross and various liquidity partners and ATSs.

- Unlike the Router, Rapid will oversize the order in search of reserve liquidity, a true pin-it-to-my-limit strategy
- Rapid allows traders to tone down aggressiveness by configuring its cycle time and oversize parameters, allowing liquidity to replenish (e.g. "Take 30% of what's displayed every 8 seconds.")
- Rapid's ability to post hidden often makes it useful in small and micro-cap situations, allowing the trader to layer the book inside of a wide spread, without showing his hand

- Dynamic Router uses a combination of historical and real-time data to choose the best venue to post out-loud; for this reason, Rapid does not work as well in deep books where out loud orders take priority.

| VWAP  TWAP |
|---|

- Both algorithms are schedule-based strategies useful for spreading an order over a specific time horizon.

- VWAP is typically used by traders more sensitive to volume patterns by trading in proportion to expected market volume. The VWAP benchmark is widely used as a gauge of trading performance.

- TWAP executes the order evenly over the user-specified time horizon and will remain on a tight schedule. This strategy is best used near the end of the day to equally spread the stock in to the closing auction.



**LX® Liquidity Cross**

# LX® Liquidity Cross

LX® Liquidity Cross

**LX aggregates all available non-displayed liquidity within the firm for clients and is seamlessly integrated with our Dynamic Router and algorithmic trading strategies.**

## Liquidity Highlights

- **LX ADV in January was 170M shares, with 2.46% market share[1]**

- Consistent volume growth from institutional and BD client base

- Continued quantitative research on the Liquidity Profiling initiative to protect customer order flow

- Deployed new network hardware in the Savvis data center resulting in a 5% improvement in median ACK latencies

## Liquidity Breakdown



Internal 1%
BD 24%
ELP 41%
Institutional 34%

## US Dark Pool Competitive Landscape – December[2]



| | |
|---|---|
| CS Crossfinder | 231 |
| GS SigmaX | 202 |
| Knight Link | 164 |
| GETCO | 141 |
| Barclays LX | 138 |
| MS Pool | 86 |
| ITG Posit | 85 |
| DB Super X | 85 |
| UBS ATS | 84 |
| LeveL | 83 |
| BIDS | 57 |
| Citi Match | 55 |
| Instinet CBX | 54 |
| Vortex | 36 |
| Millennium | 35 |

■ Broker/Dealer
■ Agency Only



1. Source: Barclays Capital internal reporting – February Report (double counted)
2. Rosenblatt Securities Inc.; January 2012 Report (double counted; December 2011 statistics)



7

# New LX® Liquidity Profiling

**The objective of the new LX® Liquidity Profiling framework is to increase fill rates and improve performance for institutions trading in LX by targeting beneficial counterparties.**

- **Legacy entitlement framework defines client segments statically**
  - Clients used to be statically assigned to a "segment" during onboarding as follows:
    - *Institutional* – Clients accessing LX via Barclays Capital's algorithms or Dynamic Router  (40% of LX volume)
    - *Broker-Dealer* – Full-service and regional BDs sending agency order flow directly to LX (25%)
    - *Electronic Liquidity Providers (ELPs)* – High frequency and multi-strategy firms who make markets in LX (30%)
    - *Barclays Capital Internal* – Equity Market Making, NYSE DMM, and Options MM delta hedges (5%)
  - Clients had the ability to prevent crossing with specific segments

- **However, clients within a given segment exhibit divergent flow characteristics**
  - The ELP segment contains some clients that provide "aggressive" liquidity as well as clients that provide beneficial liquidity that should be accessed by all clients
  - The Broker-Dealer segment contains some "passive", beneficial flows, but also some aggressive flows where, for example, proprietary trading firms are using BDs to access LX

- **The new LX Liquidity Profiling framework scores individual clients based on the quality of their order flow**
  - Creates objective criteria to profile clients, e.g., short-term alpha, order size, provide vs. take ratio
  - A powerful tool to proactively monitor LX and work with clients to improve the quality of flows into the pool
  - Allows Barclays to regularly evaluate client profiles as opposed to a one-off categorization at onboarding



# New LX® Liquidity Profiling



**Constantly Monitoring Flow Quality**

- The new LX Liquidity Profiling framework provides Barclays Capital with transparency into the flow coming from individual participants in LX:

  ▸ Firms classified as ELPs include both aggressive and *passive* liquidity providers, e.g. those operating market making strategies

  ▸ Institutions and BDs segments include both passive and *aggressive* liquidity providers, e.g., those with high-alpha flows

- By understanding the characteristics of flow at the client level, Barclays Capital can improve the overall quality of LX liquidity:

  ▸ Passive liquidity providers can be identified and encouraged

  ▸ High alpha takers can be held accountable, e.g., by demanding liquidity providing strategies, or by refusing a client access

  ▸ Natural selection – transparency means aggressive flows will tend to be suppressed by clients

*Note: This chart represents the top 100 clients in LX (~86% of total flow). The analysis spans more than 11.3 million trades.*



9

# Liquidity Profiling Factors

**LX® Liquidity Cross**

| Factor | Definition |
|---|---|
| **1-Second Take Alpha** | **Movement of the mid-quote from the time of the trade to one second later, normalized by the size of the spread.**<br><br>*Note: It was determined that the 1-second horizon is the most reliable metric based on experimentation with various horizons and feedback from many LX clients. 30- and 60-second alphas correlate well with 1-second alphas but have larger standard errors.* |
| **Modified Take Percentage** | **A measure of how often a client is attempting to provide versus take liquidity in LX.**<br><br>*Note: Mid-point and passive pegged orders which are sent with a DAY time in force are always treated as liquidity providing, even if they cross on entry.* |
| **Normalized Order Size** | **Average client order size in LX, normalized by the average execution size in the market, for an individual name.**<br><br>*For example, client sends 300 share orders in SPY, and LX average execution size in SPY is 235.  Client therefore has a 1.27 score for order size.* |

Analysis of factors continues, e.g., to include parent-level metrics for clients using Barclays Capital's algos. For example, how do various counterparties in LX affect slippage vs. time weighted average mid-quote or price drift.



## Dynamic Router

# Dynamic Router

**Barclays Capital's Dynamic Router uses unique market intelligence, predictive liquidity models, and high-performance technology to maximize fill rates while reducing information leakage.**

### Predictive Liquidity Models

Synthesizes historical and real-time data and executions to predict liquidity

- Probability of fill models for both aggressive and passive trading
- Dark and hidden liquidity forecasting
- Based on research at the symbol by venue level

### Unique Market Intelligence

Utilizes the unique liquidity and technology throughout the firm to enhance execution logic

- #3 Broker-dealer ATS, Barclays Capital LX Liquidity Cross[1]



**Dynamic Router**

### High-Performance Technology

Offers high performance access to all major exchanges and dark pools

- Co-located connectivity and market data
- Hardware accelerated technology

**Maximizes fill rates**

**Minimizes information leakage**

### How Dynamic Router Compares

- ☑ **Symbol-based logic** vs. sector/capitalization models

- ☑ **Dynamic** capabilities vs. static logic

- ☑ **Latency arbitrage**

- ☑ **Predictive**: hunting liquidity through *probability of fill* models

- ☑ **Access to LX**

---

1. *Rosenblatt Securities Inc. and Barclays Capital analysis*



# Traditional SOR vs. Dynamic Router

**Dynamic Router**

## Execution Logic

| | Traditional Static Order Routers | **VS.** | Barclays Capital's Dynamic Router |
|---|---|---|---|
| **Venue Ranking** | ▪ Venues ranked statically across groups of symbols | | ▪ Venues ranked dynamically at the symbol level, based on historical and real-time fill rate data |
| **Dark Access** | ▪ Sequential pinging (All dark venues before going to lit markets)<br>▪ Orders continue to check venues that do not fill orders (leakage) | | ▪ Parallel routing to all venues based on probability of fill<br>▪ Orders to dark venues are sized to match the expected liquidity |
| **Posting** | ▪ Orders posted to venues with the highest rebate | | ▪ Orders post to venues based on probability of fill<br>▪ Intelligent reserve order sizing to limit information leakage |
| **Profiling** | ▪ Same execution logic across all stocks<br>▪ Models based on historical data only | | ▪ Stock specific logic based on market & order characteristics<br>▪ Models consider real time and historical events |

### Strategy

- ▪ Treat all venues the same based on execution quality
- ▪ Utilize Barclays Capital's volume to enhance real-time models
- ▪ Incorporate high frequency capabilities into product/systems
- ▪ Gain volumes from clients/internal desks and mindshare with regulators

## Performance

| | Traditional Static Order Routers | Barclays Capital's Dynamic Router |
|---|---|---|
| **Exchange Fill Rate** | 75% | **95%** |
| **Dark Fill Rate** | 10% | **25%** |
| **Dark Symbols Pinged** | 4,000 | **1,500** |
| **Venues Per Order** | 5 | **3** |
| **Algo Posted Fill Rate** | 12% | **25%** |
| **Latency** | 30ms | **15ms** |

- ▪ Increased fill rates in lit and dark venues
- ▪ Reduced dark venues checked and pinged to reduce information leakage
- ▪ Increased overall order placement efficiency



# Dynamic Router Reporting

Dynamic Router

## Measure execution quality with Dynamic Router performance reports

- Execution summaries for posting and taking

- Venue toxicity analysis

- Mean reversion analysis

- Symbol analysis



*FOR ILLUSTRATIVE PURPOSES ONLY*



**Portfolio WebBench® Analytics**

# Portfolio WebBench®

**Portfolio WebBench® is Barclays Capital's flagship execution analytics toolkit for global equity portfolios, offering insight into every stage of the investment process, from portfolio construction to post-trade analysis.**



Portfolio WebBench generates a broad range of analytical reports



Portfolio WebBench supports all phases of the investment cycle

- **Portfolio Construction:** Construction and rebalancing optimization tools that provide market impact cost accounting, risk factor analysis, optimal hedging strategies, and holdings analysis

- **Pre-Trade Analysis:** Liquidity screening, market impact cost forecasting, optimal trade scheduling, risk and volatility analysis, recent performance, and streamlined risk bids

- **Execution:** Real-time monitoring of progress and slippage relative to seventeen benchmarks

- **Post-Trade Analysis:** Slippage details and transaction summary reports



# Portfolio WebBench® Pre-Trade Analysis

Portfolio WebBench® Analytics

## New Dynamic Interface for Single Stock Analytics

**Performance (new)**
Charts intraday and historical performance and traded volumes of any stock against the market.

**Liquidity Statistics**
Predictive liquidity models analyze observed liquidity flows and provide forecasts based on proprietary technology.

**Intraday Profiles**
An intraday volume profile displays the aggregated ADV of a single name throughout the day.

**Product Statistics**
Individual product data statistics for the stock.

**Risk Statistics**
Calculates volatility on an annualized basis, as well as beta, stock risk and fundamental factor exposures for a given name.

**Market Impact Statistics**
View the market impact of any trade using various aggressiveness settings to plot Impact Cost and Execution Risk.



15

# Portfolio WebBench® Live

## Real-time Order Transparency, Intra-trade Intelligence, Flexible Web Interface

Portfolio WebBench® Live is a web-based execution monitoring application that provides a unique window into the performance of your trade through real-time transaction cost analysis. Portfolio WebBench Live offers enhanced order transparency, allowing traders to pinpoint and react to risk as a transaction unfolds.

### Real-Time Capabilities

- Live performance monitoring against multiple benchmarks
- Slippage decomposition by capitalization, region, order size, average daily volume percentage and side
- Execution venue breakdown, including displayed and non-displayed liquidity pools
- Performance heat map to assess slippage drivers
- Downloadable execution reports in Microsoft Excel® format

### Intra-Trade Intelligence

- Monitor and measure performance in real time
- Identify and manage trading risks
- Measure aggregate performance by grouping orders
- Decompose slippage drivers to pinpoint problem areas
- Adapt trading strategies in response to real-time information
- Enhance communication and provide greater transparency







# Portfolio WebBench® Live

**Portfolio WebBench® Analytics**

T+0 Reports available

Set user preferences

Share view with others

Group trades by category (e.g., sector, strategy, region, trader)

Select benchmark

Order participation in total available liquidity at a given point in time

Access your order blotter

Slippage vs. selected benchmark

Executed shares and notional values at a given point in time

Real-time performance against multiple benchmarks

Assess slippage drivers with the performance heat map

Slippage decomposition by capitalization, region, order size, % of average daily volume, and side

Choose columns to import directly into Excel®

Venue breakdown

Individual order and slippage details. Configure columns using the column chooser and drag and drop into place. (Grouping is controlled by 'Group By' function)

**Portfolio WebBench Live** (keyword: pwbl)    File   Options   Help

Blotter    Group By: None    Benchmark: Interval Vwap    Interval Vwap Slippage: +81.60

**Volume Profile** — Executions · Cumulative Executions

**Liquidity Consumption** — Executed Volume

**Slippage Time Series** — Interval Vwap Slippage

**Performance Map** — Financial / Technology — G.S.N, C.N, BAC.N, MSFT.OQ, IBM.N — Interval Vwap Slippage − + max/min: 364.65/-324.68 Excl'd

**Execution By Venue** — Level1 ATS, NYSE, Electronic Liquidity Provider, DirectEdge, CSFB CrossFinder, Barclays LX, Regionals / ECNs

| Order Summary | | | | |
|---|---|---|---|---|
| Group By | # | Total Shares | Exec Qty | Exec Value |
| Total | 5 | 729,000 | 24,190 | 1,551,256 |
| ▼ Region | | | | |
| US | 5 | 729,000 | 24,190 | 1,551,256 |
| ▼ Side | | | | |
| Buy | 2 | 376,600 | 9,676 | 138,898 |
| Sell | 3 | 352,400 | 14,514 | 1,412,357 |
| ▼ Duration | | | | |
| > 30 min | 5 | 729,000 | 24,190 | 1,551,256 |
| ▼ Market Cap | | | | |
| Large (>10M) | 5 | 729,000 | 24,190 | 1,551,256 |
| ▼ Percentage ADV | | | | |

**Detailed** — As of Time: 16:00:13 — Search

| X | Ric | Side | Order Qty | Exec Qty | Avg Px | Order Status | Strategy | Ref Start | Ref End Time | Interval VWAP | Interval VWAP Px Slpg | Arrival Px Slpg | Open Px Slpg | Arrival Last Px Slpg | FullDay Vwap Px Slpg | Prev Close Px Slpg |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | IBM.N | Sell | 126,200 | 4,838 | 129.4100 | Partially filled | VWAP | 09:30:00 | 16:00:00 | 127.7267 | 131.79 | 47.75 | 53.61 | 131.79 | | 39 |
| | MSFT.OQ | Buy | 188,300 | 4,838 | 24.8500 | Partially filled | VWAP | 09:30:00 | 16:00:00 | 24.2897 | -230.67 | -222.13 | -222.13 | -222.13 | -230.67 | -163 |
| | GS.N | Sell | 126,200 | 4,838 | 149.2000 | Partially filled | VWAP | 09:30:00 | 16:00:00 | 148.0648 | 75.31 | 106.00 | 119.37 | 119.37 | 75.31 | 146 |
| | C.N | Buy | 188,300 | 4,838 | 3.8600 | Partially filled | VWAP | 09:30:00 | 16:00:00 | 3.7386 | -324.68 | -198.15 | -211.64 | -211.64 | -324.68 | -184 |
| | BAC.N | Sell | 100,000 | 4,838 | 13.3200 | Partially filled | VWAP | 09:30:00 | 16:00:00 | 12.8514 | 364.65 | 265.90 | 261.94 | 261.94 | 364.65 | 230 |



# Appendix

# US Equities Market

**Broker-dealer crossing venues continue to take market share from traditional exchanges.**

| Market ADV – January 2012 | Market Share Trends (2006-2012 YTD) |
|---|---|

**Total ADV = 6.9 Billion Shares**

Pie chart (Market ADV – January 2012):
- NASDAQ 19%
- NASDAQ PSX 1%
- NYSE Arca 12%
- NYSE 12%
- B/D Crossing 16%
- BATS Z 9%
- BATS Y 2%
- DirectEdge 9%
- BEX 2%
- Regionals 1%
- Other Off-Exchange 19%

Line chart (Market Share Trends 2006-2012 YTD):
- NYSE
- NASDAQ
- DirectEdge
- BATS
- BD Dark Pools
Y-axis: 0% to 50%. X-axis: 2006, 2007, 2008, 2009, 2010, 2011, 2012.

*Sources: Barclays Capital Analysis, BATS Trading, Arca Vision*



# Disclaimer

This document has been prepared by Barclays Capital, the investment banking division of Barclays Bank PLC ("Barclays"), for information purposes only. This document is an indicative summary of the terms and conditions of the securities/transaction described herein and may be amended, superseded or replaced by subsequent summaries. The final terms and conditions of the securities/transaction will be set out in full in the applicable offering document(s) or binding transaction document(s).

This document shall not constitute an underwriting commitment, an offer of financing, an offer to sell, or the solicitation of an offer to buy any securities described herein, which shall be subject to Barclays' internal approvals. No transaction or services related thereto is contemplated without Barclays' subsequent formal agreement. Barclays is acting solely as principal and not as advisor or fiduciary. Accordingly you must independently determine, with your own advisors, the appropriateness for you of the securities/transaction before investing or transacting. Barclays accepts no liability whatsoever for any consequential losses arising from the use of this document or reliance on the information contained herein.

Barclays does not guarantee the accuracy or completeness of information which is contained in this document and which is stated to have been obtained from or is based upon trade and statistical services or other third party sources. All opinions and estimates are given as of the date hereof and are subject to change. The products mentioned in this document may not be eligible for sale in some states or countries, nor suitable for all types of investors; their value and the income they produce may fluctuate and/or be adversely affected by exchange rates, interest rates, or other factors. Products and features are subject to change without notice. All controls mentioned are on a best efforts basis and Barclays is not liable for controls failing or system issues associated.

Barclays, its affiliates and the individuals associated therewith may (in various capacities) have positions or deal in transactions or securities (or related derivatives) identical or similar to those described herein.

IRS Circular 230 Disclosure: Barclays Capital and its affiliates do not provide tax advice. Please note that (i) any discussion of U.S. tax matters contained in this communication (including any attachments) cannot be used by you for the purpose of avoiding tax penalties; (ii) this communication was written to support the promotion or marketing of the matters addressed herein; and (iii) you should seek advice based on your particular circumstances from an independent tax advisor.

BARCLAYS CAPITAL INC., THE UNITED STATES AFFILIATE OF BARCLAYS CAPITAL, THE INVESTMENT BANKING DIVISION OF BARCLAYS BANK PLC, ACCEPTS RESPONSIBILITY FOR THE DISTRIBUTION OF THIS DOCUMENT IN THE UNITED STATES. ANY TRANSACTIONS BY U.S. PERSONS IN ANY SECURITY DISCUSSED HEREIN MUST ONLY BE CARRIED OUT THROUGH BARCLAYS CAPITAL INC., 200 PARK AVENUE, NEW YORK, NY 10166.

NO ACTION HAS BEEN MADE OR WILL BE TAKEN THAT WOULD PERMIT A PUBLIC OFFERING OF THE SECURITIES DESCRIBED HEREIN IN ANY JURISDICTION IN WHICH ACTION FOR THAT PURPOSE IS REQUIRED. NO OFFERS, SALES, RESALES OR DELIVERY OF THE SECURITIES DESCRIBED HEREIN OR DISTRIBUTION OF ANY OFFERING MATERIAL RELATING TO SUCH SECURITIES MAY BE MADE IN OR FROM ANY JURISDICTION EXCEPT IN CIRCUMSTANCES WHICH WILL RESULT IN COMPLIANCE WITH ANY APPLICABLE LAWS AND REGULATIONS AND WHICH WILL NOT IMPOSE ANY OBLIGATION ON BARCLAYS OR ANY OF ITS AFFILIATES.

THIS DOCUMENT DOES NOT DISCLOSE ALL THE RISKS AND OTHER SIGNIFICANT ISSUES RELATED TO AN INVESTMENT IN THE SECURITIES/TRANSACTION. PRIOR TO TRANSACTING, POTENTIAL INVESTORS SHOULD ENSURE THAT THEY FULLY UNDERSTAND THE TERMS OF THE SECURITIES/TRANSACTION AND ANY APPLICABLE RISKS.

Barclays Bank PLC is registered in England No. 1026167. Registered Office: 1 Churchill Place, London E14 5HP. Copyright Barclays Bank PLC, 2008 (all rights reserved). This document is confidential, and no part of it may be reproduced, distributed or transmitted without the prior written permission of Barclays.



**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**
**CIVIL COVER SHEET**

| **I. (a) PLAINTIFFS** ( Check box if you are representing yourself ☐ ) | **DEFENDANTS** ( Check box if you are representing yourself ☐ ) |
|---|---|
| Great Pacific Securities, on behalf of itself and all other similarly situated, | Barclays PLC, Barclays Capital, Inc., and Does 1-5, inclusive, |

| **(b)** County of Residence of First Listed Plaintiff    Orange | County of Residence of First Listed Defendant    United Kingdom |
|---|---|
| *(EXCEPT IN U.S. PLAINTIFF CASES)* | *(IN U.S. PLAINTIFF CASES ONLY)* |

| **(c)** Attorneys (*Firm Name, Address and Telephone Number*)  If you are representing yourself, provide the same information. | Attorneys (*Firm Name, Address and Telephone Number*)  If you are representing yourself, provide the same information. |
|---|---|
| Cotchett, Pitre & McCarthy, LLP<br>840 Malcolm Road, Ste. 200<br>Burlingame, CA 94010<br>(650) 697-6000 | |

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

☐ 1. U.S. Government Plaintiff
☐ 3. Federal Question (U.S. Government Not a Party)
☐ 2. U.S. Government Defendant
☒ 4. Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES**-For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☒ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN** (Place an X in one box only.)

☒ 1. Original Proceeding
☐ 2. Removed from State Court
☐ 3. Remanded from Appellate Court
☐ 4. Reinstated or Reopened
☐ 5. Transferred from Another District (Specify)
☐ 6. Multi-District Litigation

**V. REQUESTED IN COMPLAINT: JURY DEMAND:** ☒ Yes ☐ No  (Check "Yes" only if demanded in complaint.)

**CLASS ACTION under F.R.Cv.P. 23:** ☒ Yes ☐ No    ☒ **MONEY DEMANDED IN COMPLAINT:** $ 75,000.00 +

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause.  Do not cite jurisdictional statutes unless diversity.)

Concealment; Violation of California Business & Professional Code Sections 17200 & 17500

**VII. NATURE OF SUIT** (Place an X in one box only.)

| OTHER STATUTES | CONTRACT | REAL PROPERTY CONT. | IMMIGRATION | PRISONER PETITIONS | PROPERTY RIGHTS |
|---|---|---|---|---|---|
| ☐ 375 False Claims Act | ☐ 110 Insurance | ☐ 240 Torts to Land | ☐ 462 Naturalization Application | **Habeas Corpus:** | ☐ 820 Copyrights |
| ☐ 400 State Reapportionment | ☐ 120 Marine | ☐ 245 Tort Product Liability | ☐ 465 Other Immigration Actions | ☐ 463 Alien Detainee | ☐ 830 Patent |
| ☐ 410 Antitrust | ☐ 130 Miller Act | ☐ 290 All Other Real Property | | ☐ 510 Motions to Vacate Sentence | ☐ 840 Trademark |
| ☐ 430 Banks and Banking | ☐ 140 Negotiable Instrument | **TORTS** | | ☐ 530 General | **SOCIAL SECURITY** |
| ☐ 450 Commerce/ICC Rates/Etc. | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | **PERSONAL INJURY** | **TORTS** | ☐ 535 Death Penalty | ☐ 861 HIA (1395ff) |
| ☐ 460 Deportation | | ☐ 310 Airplane | **PERSONAL PROPERTY** | **Other:** | ☐ 862 Black Lung (923) |
| ☐ 470 Racketeer Influenced & Corrupt Org. | ☐ 151 Medicare Act | ☐ 315 Airplane Product Liability | ☒ 370 Other Fraud | ☐ 540 Mandamus/Other | ☐ 863 DIWC/DIWW (405 (g)) |
| ☐ 480 Consumer Credit | ☐ 152 Recovery of Defaulted Student Loan (Excl. Vet.) | ☐ 320 Assault, Libel & Slander | ☐ 371 Truth in Lending | ☐ 550 Civil Rights | ☐ 864 SSID Title XVI |
| ☐ 490 Cable/Sat TV | | ☐ 330 Fed. Employers' Liability | ☐ 380 Other Personal Property Damage | ☐ 555 Prison Condition | ☐ 865 RSI (405 (g)) |
| ☐ 850 Securities/Commodities/Exchange | ☐ 153 Recovery of Overpayment of Vet. Benefits | ☐ 340 Marine | ☐ 385 Property Damage Product Liability | ☐ 560 Civil Detainee Conditions of Confinement | **FEDERAL TAX SUITS** |
| ☐ 890 Other Statutory Actions | ☐ 160 Stockholders' Suits | ☐ 345 Marine Product Liability | **BANKRUPTCY** | **FORFEITURE/PENALTY** | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| ☐ 891 Agricultural Acts | ☐ 190 Other Contract | ☐ 350 Motor Vehicle | ☐ 422 Appeal 28 USC 158 | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 871 IRS-Third Party 26 USC 7609 |
| ☐ 893 Environmental Matters | ☐ 195 Contract Product Liability | ☐ 355 Motor Vehicle Product Liability | ☐ 423 Withdrawal 28 USC 157 | ☐ 690 Other | |
| ☐ 895 Freedom of Info. Act | ☐ 196 Franchise | ☐ 360 Other Personal Injury | **CIVIL RIGHTS** | **LABOR** | |
| ☐ 896 Arbitration | **REAL PROPERTY** | ☐ 362 Personal Injury-Med Malpractice | ☐ 440 Other Civil Rights | ☐ 710 Fair Labor Standards Act | |
| ☐ 899 Admin. Procedures Act/Review of Appeal of Agency Decision | ☐ 210 Land Condemnation | ☐ 365 Personal Injury-Product Liability | ☐ 441 Voting | ☐ 720 Labor/Mgmt. Relations | |
| | ☐ 220 Foreclosure | ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability | ☐ 442 Employment | ☐ 740 Railway Labor Act | |
| ☐ 950 Constitutionality of State Statutes | ☐ 230 Rent Lease & Ejectment | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 443 Housing/ Accommodations | ☐ 751 Family and Medical Leave Act | |
| | | | ☐ 445 American with Disabilities-Employment | ☐ 790 Other Labor Litigation | |
| | | | ☐ 446 American with Disabilities-Other | ☐ 791 Employee Ret. Inc. Security Act | |
| | | | ☐ 448 Education | | |

**FOR OFFICE USE ONLY:**    Case Number:

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**
**CIVIL COVER SHEET**

**VIII.  VENUE:** Your answers to the questions below will determine the division of the Court to which this case will be initially assigned.  This initial assignment is subject to change, in accordance with the Court's General Orders, upon review by the Court of your Complaint or Notice of Removal.

| QUESTION A:  Was this case removed from state court? | STATE CASE WAS PENDING IN THE COUNTY OF: | INITIAL DIVISION IN CACD IS: |
|---|---|---|
| ☐ Yes  ☒ No<br><br>If "no," skip to Question B.  If "yes," check the box to the right that applies, enter the corresponding division in response to Question E, below, and continue from there. | ☐ Los Angeles, Ventura, Santa Barbara, or San Luis Obispo | Western |
| | ☐ Orange | Southern |
| | ☐ Riverside or San Bernardino | Eastern |

| QUESTION B:  Is the United States, or one of its agencies or employees, a PLAINTIFF in this action? | **B.1.** Do 50% or more of the defendants who reside in the district reside in Orange Co.?<br><br>*check one of the boxes to the right* ➡ | ☐ YES.  Your case will initially be assigned to the Southern Division. Enter "Southern" in response to Question E, below, and continue from there. |
|---|---|---|
| ☐ Yes  ☒ No | | ☐ NO.  Continue to Question B.2. |
| | **B.2.** Do 50% or more of the defendants who reside in the district reside in Riverside and/or San Bernardino Counties?  (Consider the two counties together.)<br><br>*check one of the boxes to the right* ➡ | ☐ YES.  Your case will initially be assigned to the Eastern Division. Enter "Eastern" in response to Question E, below, and continue from there. |
| If "no," skip to Question C.  If "yes," answer Question B.1, at right. | | ☐ NO.  Your case will initially be assigned to the Western Division. Enter "Western" in response to Question E, below, and continue from there. |

| QUESTION C:  Is the United States, or one of its agencies or employees, a DEFENDANT in this action? | **C.1.** Do 50% or more of the plaintiffs who reside in the district reside in Orange Co.?<br><br>*check one of the boxes to the right* ➡ | ☐ YES.  Your case will initially be assigned to the Southern Division. Enter "Southern" in response to Question E, below, and continue from there. |
|---|---|---|
| ☐ Yes  ☒ No | | ☐ NO.  Continue to Question C.2. |
| | **C.2.** Do 50% or more of the plaintiffs who reside in the district reside in Riverside and/or San Bernardino Counties?  (Consider the two counties together.)<br><br>*check one of the boxes to the right* ➡ | ☐ YES.  Your case will initially be assigned to the Eastern Division. Enter "Eastern" in response to Question E, below, and continue from there. |
| If "no," skip to Question D.  If "yes," answer Question C.1, at right. | | ☐ NO.  Your case will initially be assigned to the Western Division. Enter "Western" in response to Question E, below, and continue from there. |

| QUESTION D:  Location of plaintiffs and defendants? | **A.**<br>Orange County | **B.**<br>Riverside or San Bernardino County | **C.**<br>Los Angeles, Ventura, Santa Barbara, or San Luis Obispo County |
|---|---|---|---|
| Indicate the location(s) in which 50% or more of *plaintiffs who reside in this district* reside.  (Check up to two boxes, or leave blank if none of these choices apply.) | ☒ | ☐ | ☐ |
| Indicate the location(s) in which 50% or more of *defendants who reside in this district* reside.  (Check up to two boxes, or leave blank if none of these choices apply.) | ☐ | ☐ | ☐ |

| **D.1.  Is there at least one answer in Column A?** | **D.2.  Is there at least one answer in Column B?** |
|---|---|
| ☒ Yes    ☐ No | ☐ Yes    ☐ No |
| If "yes," your case will initially be assigned to the<br>SOUTHERN DIVISION.<br>Enter "Southern" in response to Question E,  below, and continue from there.<br>If "no," go to question D2 to the right. ➡ | If "yes," your case will initially be assigned to the<br>EASTERN DIVISION.<br>Enter "Eastern" in response to Question E,  below.<br>If "no," your case will be assigned to the WESTERN DIVISION.<br>Enter "Western" in response to Question E, below. ⬇ |

| QUESTION E: Initial Division? | INITIAL DIVISION IN CACD |
|---|---|
| Enter the initial division determined by Question A, B, C, or D above: ➡ | Southern Division |

| QUESTION F: Northern Counties? | |
|---|---|
| Do 50% or more of plaintiffs or defendants in this district reside in Ventura, Santa Barbara, or San Luis Obispo counties? | ☐ Yes  ☒ No |

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**
**CIVIL COVER SHEET**

**IX(a).  IDENTICAL CASES**: Has this action been previously filed **in this court**?          ☒ NO          ☐ YES

If yes, list case number(s):

**IX(b). RELATED CASES**: Is this case related (as defined below) to any cases previously filed **in this court**?          ☒ NO          ☐ YES

If yes, list case number(s):

Civil cases are related when they:

☐ A. Arise from the same or closely related transactions, happening, or event;

☐ B. Call for determination of the same or substantially related or similar questions of law and fact; or

☐ C. For other reasons would entail substantial duplication of labor if heard by different judges.

Check all boxes that apply.  That cases may involve the same patent, trademark, or copyright is not, in itself, sufficient to deem cases related.

**X. SIGNATURE OF ATTORNEY**
**(OR SELF-REPRESENTED LITIGANT):**                                                          DATE:  7/31/14

**Notice to Counsel/Parties:** The submission of this Civil Cover Sheet is required by Local Rule 3-1. This Form CV-71 and the information contained herein neither replaces nor supplements the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. For more detailed instructions, see separate instruction sheet (CV-071A).

---

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405 (g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405 (g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405 (g)) |

AO 440 (Rev. 06/12) Summons in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Central District of California

| | |
|---|---|
| GREAT PACIFIC SECURITIES, on behalf of itself and all other similarly situated, | ) ) ) ) |
| *Plaintiff(s)* | ) ) |
| v. | ) ) Civil Action No. **SACV14-01210 DDP (SHx)** |
| BARCLAYS PLC, BARCLAYS CAPITAL, INC., and DOES 1-5, inclusive, | ) ) ) |
| *Defendant(s)* | ) ) ) |

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)* SEE ATTACHMENT A

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure. The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:     MARK C. MOLUMPHY (168009)
COTCHETT, PITRE & McCARTHY, LLP
840 MALCOLM ROAD, STE. 200
BURLINGAME, CA 94010
(650) 697-6000

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

CLERK OF COURT

Date: _____7-31-14_____

*Signature of Clerk or Deputy Clerk*

LORI WAGERS

## <u>ATTACHMENT A</u>

**BARCLAYS PLC**
1 Churchill Place
London, E14 5HP
United Kingdom

**BARCLAYS CAPITAL, INC.**
200 Park Avenue
New York, NY 10166
United States

AO 440 (Rev. 06/12)  Summons in a Civil Action (Page 2)

Civil Action No.

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

❏ I personally served the summons on the individual at *(place)* _____
_____ on *(date)* _____ ; or

❏ I left the summons at the individual's residence or usual place of abode with *(name)* _____
_____ , a person of suitable age and discretion who resides there,
on *(date)* _____ , and mailed a copy to the individual's last known address; or

❏ I served the summons on *(name of individual)* _____ , who is
designated by law to accept service of process on behalf of *(name of organization)* _____
_____ on *(date)* _____ ; or

❏ I returned the summons unexecuted because _____ ; or

❏ Other *(specify):*



My fees are $ _____ for travel and $ _____ for services, for a total of $    0.00    .

I declare under penalty of perjury that this information is true.


Date: _____                          _____
                                                           *Server's signature*

                                                _____
                                                           *Printed name and title*


                                                _____
                                                           *Server's address*

Additional information regarding attempted service, etc: